Rappaport v Correctional Med. Care, Inc. (2021 NY Slip Op 06731)





Rappaport v Correctional Med. Care, Inc.


2021 NY Slip Op 06731


Decided on December 2, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:December 2, 2021

532096
[*1]Maryanne Rappaport, Individually and as Administrator of the Estate of Adam Rappaport, Deceased, Respondent,
v
Correctional Medical Care, Inc., et al., Appellants, et al., Defendants.

Calendar Date:October 14, 2021

Before:Garry, P.J., Egan Jr., Aarons, Reynolds Fitzgerald and Colangelo, JJ.

Steinberg, Symer & Platt, LLP, Poughkeepsie (Caryn L. Lilling of Mauro Lilling Naparty, LLP, Woodbury, of counsel), for Correctional Medical Care, Inc., appellant.
Law Office of M. Randolph Belkin, Latham (Shawn T. Nash of counsel), for Town of Guilderland, appellant.
Luibrand Law Firm, PLLC, Latham (Ashlynn R. Savarese of counsel), for respondent.



Aarons, J.
Appeal from an order of the Supreme Court (McDonough, J.), entered August 24, 2020 in Albany County, which, among other things, partially denied motions by defendants Correctional Medical Care, Inc. and Town of Guilderland for summary judgment dismissing the complaint against them.
On October 15, 2014, Adam Rappaport (hereinafter decedent), who had a history of heroin use but was withdrawing from it, was arrested and arraigned in Guilderland Town Court. On October 16, 2014, decedent was transferred from the custody of defendant Town of Guilderland (hereinafter the Town) to defendant County of Albany for detention at the Albany County Correctional Facility (hereinafter ACCF). Upon his transfer to ACCF, decedent was evaluated by a booking officer and also a nurse employed by defendant Correctional Medical Care, Inc. (hereinafter CMC). On October 18, 2014, decedent was found hanging in his cell. As a consequence of this incident, plaintiff, individually and as administrator of decedent's estate, commenced this action alleging, among other things, causes of action for negligence, wrongful death and a violation of 42 USC § 1983 against the Town and CMC, in addition to a medical malpractice claim against CMC. Following joinder of issue and discovery, CMC and the Town separately moved for summary judgment dismissing the complaint against them. Supreme Court, as relevant here, granted the motions to the extent of dismissing the 42 USC § 1983 cause of action and otherwise denied them. CMC and the Town appeal. We affirm.
Turning first to the claims asserted against CMC, the evidence tendered by CMC established that, when decedent was transferred to ACCF on October 16, 2014, a CMC-employed nurse conducted a screening of decedent and noted, among other things, a history of heroin abuse, anxiety, depression and bipolar disorder. The nurse testified at his deposition that decedent had injected two bundles of heroin on October 15, 2014, and that he understood two bundles to be the equivalent of 20 bags of heroin. The nurse's screening form noted that decedent had informed him that he had never considered or attempted suicide, that he was not feeling depressed, that he did not want to hurt himself and that he was not hearing voices. The nurse stated that decedent had stable vital signs, was alert and oriented and that, based upon decedent's prior use of heroin and withdrawal thereof, decedent would be placed on withdrawal checks. The nurse contacted the physician for CMC at ACCF to obtain an order to place decedent on opiate withdrawal checks. The CMC physician testified that decedent's scores from the screening did not warrant any other supportive treatment than what was ordered.
According to the screening form, decedent was placed in the general population and was not referred to the mental health unit. Decedent's medical records reflected that two withdrawal checks were conducted — one in the evening of October 17, 2014 and another one in [*2]the morning of October 18, 2014 — and that no major symptoms were noted. CMC also tendered an expert affidavit from a physician, who opined that the screening of decedent comported with the applicable standard of care, that decedent did not exhibit signs of suicidal ideation, that the withdrawal checks were proper and that decedent did not have significant symptoms requiring heightened intervention. CMC's expert further concluded that decedent's placement in the general population of ACCF was proper and that decedent's suicide was an unforeseeable, spontaneous act. CMC's expert also listened to a phone call between decedent and his father that took place on October 17, 2014 and opined that nothing in that call indicated that decedent was suicidal. With the foregoing proof, CMC satisfied its summary judgment burden (see Gallagher v Cayuga Med. Ctr., 151 AD3d 1349, 1352-1353 [2017]; see generally Gordon v City of New York, 70 NY2d 839 [1987]).
In opposition thereto, plaintiff's expert opined, among other things, that, based upon decedent's usage of 20 bags of heroin on October 15, 2014, decedent would have experienced certain withdrawal symptoms one to two days thereafter and, therefore, required constant supervision. This particular opinion, however, is speculative and has no basis in the record (see Humphrey v Riley, 163 AD3d 1313, 1315 [2018]). Indeed, the withdrawal checks conducted on October 17 and 18, 2014 did not reflect that decedent suffered the symptoms that plaintiff's expert opined decedent would have suffered in that specific time period. Accordingly, to the extent that plaintiff premises her claim that constant supervision of decedent at ACCF was required due to his heroin withdrawal symptoms, plaintiff failed to raise an issue of fact.
Notwithstanding the foregoing, plaintiff's expert also opined that the failure to place decedent under constant supervision stemmed from CMC's failure to adhere to its policies and procedures and to properly ascertain decedent's suicide history. To that end, plaintiff's expert concluded that CMC's screening and treatment of decedent and the decisions to place him in the general population where he was not under constant supervision and not to refer him for a further mental health evaluation did not meet the applicable standard of care. Plaintiff cites to CMC's policies and procedures providing that screeners would review any history of suicidal behavior and that incarcerated individuals with a "psych history . . . will be referred to mental health for additional evaluation and testing." The policies and procedures also stated that "[p]ositive responses to mental health screening questions require a referral to [m]ental [h]ealth." Indeed, the CMC doctor testified that, if suicidal tendencies were revealed during a screening of an incarcerated individual, the mental health unit would be notified by "[t]he quickest means possible." A booking officer noted in a separate initial screening that [*3]decedent had a history of counseling and mental health treatment and that decedent would be referred to the mental health unit.[FN1] The nurse's screening form noted that decedent had previously been in ACCF — a history which included decedent indicating that, on a prior occasion, he had attempted suicide. Yet, as mentioned, decedent was not referred to the mental health unit. The record also indicates that decedent was supposed to undergo three withdrawal checks a day but this was not done. Viewing this evidence in the light most favorable to plaintiff, as the nonmovant, plaintiff raised a triable issue of fact regarding CMC's screening of decedent and whether CMC adhered to its policies and procedures (see Tkacheff v Roberts, 147 AD3d 1271, 1274-1275 [2017]; Thomas v Reddy, 86 AD3d 602, 604 [2011]).
As to the claims against the Town, the Town primarily argues that decedent's death was not foreseeable. The record reveals that one police officer with the Town's police department testified that, in his interview with decedent, decedent was "kind of upbeat" and that decedent spoke about his family support. Another officer stated that decedent represented that his heroin use affected his employment but that decedent "was a positive, nice young man, upbeat about it." Plaintiff, however, tendered evidence demonstrating that the officers who interviewed decedent were informed about decedent's suicidal thoughts and mental health history and that decedent presented a danger to himself. As such, whether decedent's suicide here was a foreseeable consequence of the alleged negligence is a factual question to be resolved by the trier of fact (see Iannelli v County of Nassau, 156 AD3d 767, 769 [2017]; compare Stein v Kendal at Ithaca, 129 AD3d 1366, 1367-1368 [2013]; see generally Fuller v Preis, 35 NY2d 425 [1974]). Contrary to the Town's assertion, neither the actions by ACCF's staff nor the failure by decedent's father to contact ACCF after his phone conversation with decedent constituted a superseding act that broke the causal chain (see generally Derdiarian v Felix Contr. Corp., 51 NY2d 308 [1980]).
To the extent that the Town relies on a securing order issued by a judge directing that decedent undergo a mental health referral, the record does not conclusively establish that this securing order was given by the Town to ACCF. One of the officers testified that, when bringing decedent to ACCF, the only paperwork that was brought was a prearraignment detention form. This form was one page, it did not attach the securing order and there was no notation on the form regarding a mental health evaluation for decedent. Even if a notation existed, the officer testified that he could not recall if he gave the form to the booking officer at ACCF. Meanwhile, the booking officer testified that, upon decedent's transfer to ACCF, he was never advised by the transporting officers that decedent was a suicide risk. Based on the foregoing proof, a triable issue [*4]of fact exists regarding whether the Town was negligent in failing to report to CMC officials that decedent was a suicide risk (see Iannelli v County of Nassau, 156 AD3d at 768-769; cf. Huntley v State of New York, 62 NY2d 134, 137 [1984]). The remaining contentions of CMC and the Town have been considered and are unavailing.
Garry, P.J., Egan Jr., Reynolds Fitzgerald and Colangelo, JJ., concur.
ORDERED that the order is affirmed, with costs.



Footnotes

Footnote 1: The CMC doctor explained that an incarcerated individual was first screened by the Albany County Sheriff's Department and then that suicide screening got passed to CMC.